May it please the court. The appellants are Mr. Dewey, Pastor Holick, and Pastor Holick's Little Ministry Spirit One. The court made two standing issues, two standing errors, finding one that Spirit One had no injury, but it overlooked Pastor Holick's testimony that he seeks recovery for Spirit One's expenses that it expended going in his trip to Little Rock. I have to speak up and please tell me what issue you're talking about. I'm starting with the two standing issues that are on appeal. One has to do with the trial court saying Spirit One had no injury because it had no loss. Are we talking about the ordinance challenge or the statute challenge? Both, yeah. What is, and I couldn't understand from the briefs, what is the relationship between the Well, here's what happened. The officer threatened our people with violating the permit ordinance for public assembly, but then said he arrested them. What officer, when? At the arrest site? Yes, right. Officer Allen, who's the defendant appellee. But that no charge was ever made for that, was there? No, it was the threats that he says in his testimony he made against my clients for violating the permit ordinance. So that brought us to challenge the permit ordinance because also the record shows he says he'll keep making those threats about using the permit ordinance. But then they were arrested under the disorderly conduct statute. When in the two and a half hours was this alleged threat made? He says he made it to them right when he arrested them, right before he arrested them. That was his testimony. So that's one thing though, is Spirit One's recovery for its expenses because A, the permit ordinance was used as a threat, but B, because the arrests cut short the outreach. The second standing error relates... Cut short what? Outreach? Well, this was a planned pro-life outreach, Your Honor, and so they were there for several days and this was not the end of the outreach. This was a little gathering of six people in front of the abortion clinic to pray and hold signs. Did they apply for a permit? No, they didn't. They actually were told they didn't need one. That's why the officers... When? They were told before they even started the whole outreach that if there were people at the office of the city where you get your permits. Did you have any names or positions? Well, we actually dropped that part of the claim because the statute or the permit ordinance for just a public assembly originally had no minimum on how many people were required for getting a permit. We dropped that whole claim. Now the claim has to do with, okay, let's say you qualify and required to get a permit. You have to meet these seven requirements. Well, all those seven requirements are qualified by certain words that only the city can define because the permit ordinance doesn't define them. So for that permit claim, the court said, well, we didn't have any standing because we weren't arrested pursuant to the permit. And we said, well, no, that's not the point. Or charged either. Right, and that wasn't the point. And you don't even know the meaning of the words in the permit ordinance because they aren't defined and they leave discretion. What's your best permit case then? Where there's no arrest, it's just... Well, the Plain Dealer case, we cited the Burke case. These were Supreme Court cases that allowed a lot less wiggle room to the city than the Little Rock ordinance gives Little Rock. And gosh, one of them, the Burke case, what I remember about that is they required parade people to just at least put up an indemnity quote satisfactory to the city. And that was struck down. You can't even use the word satisfactory to the city, let alone on the Plain Dealer case. I can't tell you right this second what those limits were that were struck down. But we claimed that we have standing... The 11th Circuit case cited in your table of authorities named Burke. Forgive me, Your Honor. Pardon? Forgive me if I misquoted it. But that's the gist of the standing claim is because if you can't even tell what the permit requires, then obviously you're subjecting yourself to some violation without the due process. And it puts a chill, which is in the record with our people's affidavits, that that's the effect. They can't plan another outreach if they don't even know what the rules are. So these are cases where there was no application for a permit, no denial for a permit, no arrest for not using a permit. It's just that we looked and we talked to staff and we didn't understand the requirements, so we sued. Not quite, Your Honor. The officer testified he threatened our people with violating the permit ordinance. And he said he routinely does that to gain cooperation. The record cite for the officer's statement. And what did he say? In the context of his expression. He said that he gains it to, he uses it to gain cooperation. And he said he would do it in the future. And the record cite is in the deposition. Where's the record cite for the appendix page? The trial court actually skipped over all of that and didn't even rule on the thing because she just said we didn't have standing. And I can supply the record cite. It's not jumping out at me right this second. If I could move on possibly to the disorderly conduct statute. We had three levels of complaint about it. Paragraph A-2 prohibits unreasonable or excessive noise in the trial court. It overlooked this Eighth Circuit's decision in 1990 in the language was held void for vagueness. And the arrest under the statute did not merit qualified immunity. Because it was clearly established law. The government had quite a bit of history to that. Well, maybe it did. But that's what it said. That they were not entitled to qualified immunity. It was an earlier court ruling and then the city council did not respond to the trial court ruling, right? Well, kind of. The district court back then in Nebraska had already struck down that statute and the Supreme Court in Nebraska had already questioned it. And then there was a whole host of other cases cited by the Eighth Circuit that, well, look, unreasonable noise has always forever been vague. That was fighting words during an airport seizure, Bufkins. I mean, couldn't be more factually unrelated to this case. Excuse me, Your Honor, there was a whole section on fighting words, but the other ruling had to do with unreasonable noise. Because she was arrested for both. The court held she was arrested for both and it was unreasonable for both. Because obviously you can call an officer names and it's not going to be held as fighting words. But it also held that unreasonable noise had been forever vague. And there was no qualified immunity for the arrest on either basis. That's the way I read it. In this case, the trial court also overlooked testimony that the words unreasonable noise by the city on 30B-6 mean whatever the officer says it means. So A, that goes to selective enforcement. B, it goes to the person's not knowing, well, what's unreasonable. C, it goes to the fact that if it's- I don't think that's very probative evidence. I mean- Well, it's the city's testimony. This is a facial challenge, right? Yeah, that's what the city says they interpret it to mean, anything the officer says it means. And the thing is- What's your cite for that? That was the 30B-6 testimony by Officer Bewley. I can't give you the page number. I apologize. So, joint appendix- It would be very helpful when you tell us something from the record. If you would cite us to it, it would be extremely helpful. Thank you. I see it. It's joint appendix 152. And by the way, they have discretion in that testimony to say that it means impedes or slows down. Well, the language in the statute is obstructs. So, what does obstruct mean? Does that mean impede or slow down? You're just ignoring the mens rea requirement. I'm going to get to that one, too, because we've challenged it, too. But that's what the officer did. You can't divorce them. Well, I agree with that entirely. But that's what the officer did, because if you read the testimony, he saw them obstructing. And we have affidavits in the record that the trial court overlooked saying there was no mens rea for inconvenience, annoyance, or alarm. Who says that? Our affidavits in the record that the trial court overlooked. So, that goes to- I mean, what's the basis for an assertion that the city ignores the plain meaning of the statute? It's a state statute. Well, A, the city actually adopted the state statute by ordinance, section 1802 or 18-2. That's not in the case. Yes, it is. We cited that in our brief. But the challenge is to the statute. Yes. The challenge is to three parts of the statute, this inconvenience, annoyance, or alarm, the obstructs traffic, and the unreasonable noise. We cite Bufkins, that that was clearly established law in 1990, that that was vague. And clearly established law, because those officers were denied qualified immunity for that. We attack the inconvenience, annoyance, and alarm. We even cite Coates, and we even cite a Seventh Circuit case that struck down that very language in 2012. Annoyance has always been vague since at least 1971, if not before, when the Coates case was decided. But that didn't seem to be, it seemed like the officer didn't even consider the mental factor needed for the disorderly conduct statute. So these vague laws, they're dangerous. You're ignoring the limitations on these inquiries that the Stahl opinion makes clear. That the difficulty of applying a word such as annoyance is not unconstitutional if it's not indeterminate what the conduct is. And that's where the mens rea comes in. It's not, if you're annoying somebody else, I can arrest you. It's if you're intending to annoy someone else with excessive noise or by obstructing. And that's the critical difference that you're attempting to bifurcate out of the equation. Well, I'm really not trying to do that. The Seventh Circuit did strike down that phrase. That's a popular phrase. And we cited the Keating v. Bell case that struck down exactly that phrase. Stahl is our controlling authority, counsel. Right. And as a matter of fact, on that point, Your Honor, the district court held that yes, even the disorderly conduct statute relies on third parties for determining if there was a violation. That was the problem in Stahl. And here the district court even said yes. Which district court? Not the district court in this case. Yes. The district court, Judge Baker, said yes, it relies in part on the reactions of third parties because it requires you to figure out if you've annoyed somebody. And so. You have to have the intent to annoy. Well, right. That wasn't the reason officer said. Critical. That's the constitutional. Well, being the officer's arrest when he told them that they were being arrested for being annoying, not intending to annoy, and for not having a permit, he should have said, well, I'm arresting you because you're intending to create. You're talking a different case than I read in the briefs. The briefs. The briefs taught me that after two and a half hours. What's his name? Turned over, reached over and turned up the mic so that the officer, I think it was Alan, could hear it from a block away. And the businesses were complaining about that. Well, that was disputed. And number one, the businesses both said they continued to do business. And that isn't the violation of the law. The law is obstructs traffic or makes an unreasonable noise. It's an interpretation by the city that that means somebody is going to complain. You can't know if your amplifier is going to disturb a business. You're ignoring the mens re again. You refuse to take the statute as it's written. We have challenged that and said the words inconvenience, annoyance and alarm are not defined by the statute. And they've already been struck down, as has the specific word annoying. And, therefore, the third thing that we challenged was the obstructs traffic. Obstructs is not defined. It can mean anything. Again, under 30B-6, the city says it means whatever the city wants it to mean. And, therefore, as the district court said on page six four times, the officer claimed my guy was impeding traffic. Not obstructing. Impeding. So we gave the court, in response to Mr. Men's 28J thing, a Davidson v. City of Stafford, Texas case where that court had an ordinance that even did define obstructs as meaning impede or slow down. And that court said, no, you can't arrest people handing out literature without allowing. What court was this? The Fifth Circuit, Your Honor. You can't arrest people for handing out literature just because somebody slows down to take it. If they're not severely restricting passage, then maybe, then it might work. But we point to that because the definition of obstructs was at issue. And it had at least a little definition that the disorderly conduct statute doesn't have at all. And you're saying that's a question of fact? I'm saying that there is no definition at all to this disorderly conduct statute. And it's a penal statute. It's undefined. It's left to the discretion. I better hurry along. Well, counsel, you're in your rebuttal time now. Do you desire to reserve any? Yeah. I'll save some time. Thank you, Your Honor. I'll sit down. Thank you. Thank you, Mr. Massall. Mr. Mann for the city of Little Rock. Thank you, Your Honor. May it please the court. I'm Bill Mann. I'm with Little Rock City Attorney's Office. I'm here today representing the city of Little Rock as well as Lieutenant Sidney Allen of the Little Rock Police Department. It's a great honor to appear before the court, and I appreciate the opportunity. I think a good backdrop for this case is a statement from the United States Supreme Court in U.S. v. Grace, where it said people who wish to propagandize protests or views do not have the constitutional right to do so whenever, wherever, and however they wish to do so. Other folks, especially these folks in this small office park in Little Rock, also had rights. The city of Little Rock Police Department anticipated the event of September 14, 2012, and prepared for the guests who were coming to express their pro-life views. They issued an operational order through Assistant Chief Wayne Bewley in which the order specifically said and recognized that the group that was organizing the event, Operation Save America, had deeply held religious-based views that were anti-abortion. Everyone recognizes that. The mission of the operational order was to provide a safe environment for the people to express their views, for any counter-protesters who might appear, as well as for other citizens of the city of Little Rock. If I may, I want to move to the public assembly permit ordinance and address the challenge to that. First, with respect to standing on an as-applied basis, it's undisputed in the record, Your Honors, that this permit ordinance had nothing to do with this case. One, there was no application for a permit. No permit was applied for. No permit was issued. The permit ordinance never came into play with respect to these individuals. Is there any evidence about who may have been talked to to request whether a permit was needed or who would have communicated that none was needed to have this event? Yes, Your Honor. If I may, Ms. Messel is correct with respect to the number of people that used to be required. There was not a number. It was interpreted by the Police Department to be greater than 10. But when an application was made, it went to the Public Works Department. And in this case, that's where Mr. Kaiser, Mark Kaiser, who is one of the associates with this group, testified in his deposition that he contacted the Public Works Department, indicated how many people would be appearing, and was told then that there would not be a permit needed at that time. Subsequent evidence showed that there really were many more people out there and would have required a permit, but they did not require them to do so anyway. And what I mean by that was the day before this particular event occurred, the arrests, the protesters were at Little Rock Central High School, where the evidence in the record is undisputed that they had 30 to 50 people out there, yet the Police Department did not require them to go get a permit. They permitted them to peacefully conduct their protests. So again, you said none was applied for? Correct. None was needed? Correct. None was denied? None was needed at this time, based upon the information provided to the Public Works Department, which is where the applications go. And in addition to that, the evidence in the record is undisputed that they were not charged with violating the permit ordinance. In other words, they were not taken to court and charged with conducting a public assembly without a permit. That never occurred. What about this threat? Pardon me, sir? What about this threat that counsel talks about? Well, it was not a threat, Your Honor. What occurred was Lieutenant Allen explained to the folks out there that they did not have a permit, but that he was not going to stop them from carrying on their protests. And it's also not undisputed that there were more than six people out there. I know they've said six, but from time to time, especially the day before the arrest, Mr. Hollick testified in his deposition that there were 20 to 40 people out there. It was a very fluid situation as to the number of people who came and went and appeared at the clinic on this particular day. And Lieutenant Allen did not require them to have a permit, even though he told them, you know, you're getting close here. You're to the point where you're perhaps going to need one, but I'm not going to require you to have one. The permit ordinance just did not come into play here. And kind of moving away from the permit ordinance to the noise and obstruction aspect of this, is it true that the officer was under the impression that it's his discretion to decide what is too loud or what is annoying? Well, it was not just his discretion, Your Honor. He evaluated all of the evidence in the record at the time he made the decision to make an arrest for disorderly conduct. And the evidence in the record, which is undisputed, is that one of the businesses which was adjacent to the Family Planning Services Clinic, which is the clinic that provided abortions, is the Teague Vision Clinic. It's an optometry clinic which is very, very close to the Family Planning Services Clinic. You'll see in the record we provided photographs from a crime scene specialist which shows the very confined area in which they were operating. It's a very small, confined office park. Ms. Teague, who's one of the co-owners of that business, testified in the record, in her deposition and in an affidavit, that this is the first time she could ever recall the sound of an amplifier penetrating the brick walls of her building to where she could hear it in her office, which was an interior office without windows. And she also testified that there was someone out there protesting on an almost daily basis, yet this was the first time this had ever occurred. Lieutenant Allen was made aware of this information. He was made aware of the information from Ms. Lori Williams, who's the clinical director of the Family Planning Services Clinic, who also testified that she recognized there had been people out there protesting almost on a daily basis too. Yet this was the first time that an amplifier was used to the point that she couldn't conduct patient counseling in her clinic, and that's why she called the police, and this was made, Lieutenant Allen was made aware of this. In addition to that, Detective Michelle... Did anyone either for the city or anyone else employ a sound meter to determine the decibel level of what was being projected? No, Your Honor. There was no decibel level, no decibel meter utilized. Detective Michelle Ferguson, who was also assigned to monitor this event, was positioned in an area approximately two blocks from the clinic, down adjacent to the interchange between Interstate 630 and 430 in Little Rock, with all of its accompanying interstate traffic sound. She could hear the amplifier from two blocks away. When the other officers on the scene contacted Lieutenant Allen, who was the commander of the Special Response Unit, to come back because it had complaints from Ms. Williams and from Ms. Teague, when he returned to the area, he came within one block of the clinic, rolled down the window of his police car, and he could hear the speaking going on. So within his realm of knowledge was not only the complaints of other third parties, but his perception, the perception of the other officers at the scene, and we must remember that when one is making a determination about probable cause to arrest, the officer who makes the arrest is entitled to rely upon the collective knowledge of all officers available who have the information. And Lieutenant Allen was well within his right to make an arrest. There was clearly arguable probable cause to make arrests for disorderly conduct, for making unreasonable or excessive noise. So who makes the determination of what's annoying and what's excessive noise? Well, it's based upon all the evidence, Your Honor. The police officer has to make determination based upon him making a judgment call, based upon all the evidence within his knowledge. Is the police officer supplied a standard for making that determination, or is it based on the subjective views of the individual officer? Not based upon the subjective views. I would contend, Your Honor, that it's based upon his objective listening to what's going on, basing it on third-party complaints. It's a collective thing. I assume we're talking the arrest decision now. Correct. Because you can have a trial on this. Well, there was a trial on this, and it went to— All right. Who decides whether the noise was excessive for purposes of conviction? A jury, right? In this particular case, it went to what was then called Little Rock Municipal Court, now called District Court, before Judge Alice Lytle, sitting without a jury. And if they had been convicted there, they had the absolute right to appeal to circuit court. However, they were acquitted. She made the decision that the transcript of the trial provided by the appellants in their brief to their summary judgment indicated that she said, although it was a close case, she found against the city and acquitted them of disorderly conduct. But that's—despite the fact that they were acquitted, that makes no difference in terms of whether it was arguable cause for— excuse me, probable cause for arrest, because that's not required. If I may, very briefly, Your Honors, go to the Bufkin case, which the appellants rely upon and contend it's controlling here. The city and Lieutenant Allen would respectfully submit that it does not control. And as Judge Loken said, there is a bit of history there that needs to be analyzed when considering where the Bufkins controls. In Langford v. City of Omaha, the appellant was convicted of making unreasonable noise under the Omaha City Ordinance on Disorderly Conduct. The district judge for the district in Nebraska held that using solely the word unreasonable meant that that was unconstitutionally vague. The City of Omaha did not appeal that decision, so it stood. Subsequent to that, the city did not take any action to repeal the unconstitutional subsection. The city accepted it, moved on, didn't appeal, but they did not repeal it, so it remained on the books. Subsequent to that, Ms. Bufkins was also arrested for, in part, violating that subsection of the City of Omaha Code. At trial level, the district judge—a different district judge in Nebraska dismissed the City of Omaha from the case and found that there could be no evidence that a City of Omaha policy caused an unconstitutional arrest. On appeal to this court in 1990, Bufkins v. City of Omaha, the— Counsel, we can read all that. Okay. I mean, this is a 30-year-old case. Yes, Your Honor. I just wanted to make the point that the city— Then you're briefed. Yes, Your Honor. Thank you. I also wanted to, if I could, address briefly qualified immunity. As I have indicated earlier, the testimony in the record below from Lieutenant Allen, from Detective Ferguson, from Officer Freeman, from Officer Morgan, from Gail Teague, and from Lori Williams gave Lieutenant Allen more than enough evidence to make a decision to arrest based upon probable cause. He was entitled to rely upon the veracity of the statements made by Ms. Teague and by Ms. Williams. There was certainly no existing precedent that would place him on notice that what he was doing violated the Constitution. In fact, in the state of Arkansas— pursuant to a statute or ordinance, was denied qualified immunity because the statute or ordinance was declared vague, unconstitutionally vague. No, Your Honor. I wouldn't think there is one. What I would say— When the standard is arguable probable cause. Right. As this Court stated in the case of—I hope I pronounced this correctly—Habeger v. City of Fargo, an officer on duty is entitled to make a reasonable interpretation of the law when making a decision to arrest. And in this particular case, we would respectfully submit that Lieutenant Allen did make a reasonable judgment call based upon all the evidence he had at his disposal. Now, I only have a couple minutes left before I need to yield to Mr. Fuqua. So I briefly want to note that there is no evidence that there is any basis for municipal liability in this particular case. No evidence whatsoever that the disorderly conduct statute has been enforced or implemented in such a way as to violate the rights of others in the state of Arkansas. Ms. Messel alluded to the fact that the city adopted an ordinance in which the city said, we will enforce the laws of the state of Arkansas. Well, that's true. Our police officers, by virtue of a city ordinance, are supposed to enforce the laws of our state. The criminal laws adopted by the legislature of the state of Arkansas, our officers are obligated to enforce. And there was no evidence and no notice to Lieutenant Allen that there was anything wrong with this disorderly conduct statute, which would cause him to question whether or not he could enforce it. In fact, the opposite is true. It had never been declared unconstitutional by the Arkansas Supreme Court or any federal court within this district. They want to allude to a concurring opinion in a case, Johnson v. State, in which Justice Robert Brown concurred with the affirmance of a conviction for disorderly conduct. But what he said in there about the unreasonable noise aspect of it was the testimony of the police officers did not go far enough and did not actually make a case for unreasonable or excessive noise. So in that particular case, the evidence just wasn't there, according to Justice Brown. Let me interrupt. You may have already covered this, and I didn't hear you. Does that Fifth Circuit case, Davidson, have anything to do with this case? I think it does not, Your Honor. I do not think it has anything to do with this case, Your Honor. Very well. Thank you. And at this point, I'm going to step down and yield the rest of my time to Mr. Fuqua on behalf of the county. Thank you, Mr. Mayor. Thank you, Your Honors. Mr. Fuqua? Good morning, Your Honors. I'm David Fuqua, and I represent Pulaski County, who was also sued by the appellants, and they argued below that they had been held an unreasonable length of time before being cited and released from the Pulaski County Jail. I think the central dispute, and I've had some difficulty in really getting my brain around the appellant's argument, but it seems to me the central dispute is really about rulemaking in order to have the criminal justice system work. The city of Riverside case did set something of a bright-line rule for disposition of arrestees into and out of the court system. The sheriff has a central responsibility of delivering or ensuring that people will appear in court. But that's an unreasonable delay before being a probable cause showing. Correct. Not an unreasonable delay because in jail processing of a detainee who is then released. Well, Your Honor, I don't think there's any circuit court involving opposing counsel cites a Western District of Arkansas decision allegedly declaring that an unreasonable delay in booking someone and releasing them is sort of per se unconstitutional. Is there any circuit court to that effect? I've not seen any case like that. Certainly the plaintiff, the appellant, cite no authority for the proposition that they have a constitutional right to be cited out. I was on the panel that had the case of someone who had served his or her time, I guess, in a Minnesota jail, and they just wasn't released. Right. Well, that's a different issue than someone who has been arrested and booked and then is arrested and waiting for processing. Right. This is an in-processing, not an out-processing case. What was the evidence on actually what happened once a booking took place in terms of was it just a line or was there a lack of personnel? What was the description of what actually transpired that took the 12 hours? Your Honor, the evidence in the record is that the intake area where all this happened is busy. There are people coming in all the time. There are people being out-processed all the time. There are interruptions. There was no evidence as to what specifically happened to these individuals apart from being table-processed, that is, some initial paperwork being done, being placed in a holding cell, and then waiting to be out-processed. So to say that there was any record of a minute step-by-step clock on these individuals. Does anything indicate they were treated any differently than anyone else being booked into Pulaski County? No, sir. There is evidence that there were, in the time frame they were there, there were 37 people who were released quicker than them and 19 people who were released slower than them. So honestly, they fell in about the middle of the time to complete the process. So I don't see anything unreasonable here. And that's the core question. Is there anything unreasonable that these appellants brought before the trial court to say that they should have been released sooner and that there just isn't? That's the argument we've made throughout. I've got just a few seconds. Are there any questions? Otherwise, I'll sit down. Thank you. I appreciate your time. Thank you, Mr. Fuqua. Ms. Messel, your rebuttal. Quickly, the reason Gersten came along was because of the Fourth Amendment. There was no probable cause determination before the arrest, so the court said you have to have one after the arrest. It didn't say, and then you can dilly-dally for 48 hours to think about whether you're going to cite and release people. And this kind of a policy that we've said our people, actually 30B-6 Officer Briggs, said there was no explanation for the 12-hour delay. He didn't say anything about medical or transport or anything. He said there was no explanation after he reviewed the file and testified under 30B-6 for the county. It's because, as the other testimony, which gets overlooked on our case and is supposed to be taken in the light most favorable to us, said it's because we have 48 hours. There's no rush. There's no concern. There's no urgency. And so what's predictable? Do you suggest or do you say that there's a deliberate delay, that they were going to make these people pay the price for disrupting their day or something like that? Well, that's what they would say. With a discretionary policy like this, for 48 hours, very predictably, the favored people can be cited and released any time because there's always a sergeant on duty that has that discretion, while disfavored people because. . . There's evidence of discriminatory intent here? I'm saying our people would testify that. You said, well, that's what they would say. That sounded like. . . If they were allowed to go to trial, Your Honor, the facts are supposed to be viewed in our favor. So they would testify to that because disfavored. . . Who would have said what? My clients, Mr. Dewey and Mr. Hollick, would testify that they were just left to sit and stew for 12 hours when there wasn't any reason they couldn't have been turned out because other people were turned out. Do you have any evidence of discriminatory intent? We don't have that in this record. We'd like to go to trial. People with disfavored status for their race or their political. . . Were they able to show that there were people who were brought in after them who were processed and released before them? Yes, Your Honor, that's what will be shown at trial. But if your religion or your political cause or the way you look or the color of your skin causes anybody at the jail to not really like you, they can just let you sit and stew for 48 hours because it's total discretion according to the county, and that's our beef on that. And so how many hours elapsed in this case? Well, 13 from the time they were arrested. It was, in our view, completely unconstitutional arrest, of course. Do you have a federal appellate authority for this theory of delay liability? Well, yeah, that Riverside case they rely on, Your Honor. Those are talking about the constitutional need to be brought before a magistrate and have charges explained. Well, the reason for that is the Fourth Amendment. The government's not allowed to just throw you in jail for 48 hours for the heck of it. They have to have probable cause. But you've challenged that. You've challenged the arrest. That's a distinct challenge. And we've challenged the detention as well. So you don't have an appellate case. But I don't have an appellate case on this whole issue of dilly-dallying for 48 hours before you even cite and release. They can tell you when you're booked, what time your probable cause hearing or determination can be. Challenging the 12 hours of your clients or the 48 hours that they could have used? Well, we're challenging the 48-hour policy because the testimony on 30b-6 was that was why they were held for 12 hours when they could have been turned out at any time because there was always discretion. So this is a theory of first impression? Maybe. I don't think the Fourth Amendment is the first impression. I think the government has to have probable cause to detain you. This is not a Fourth Amendment issue. Detention without a warrant is under the Fourth Amendment, according to everything I read, Your Honor. It's not a Fourteenth Amendment thing at this point. We're still talking Fourth Amendment. And do they have probable cause to arrest? No. That was thrown out. Do they have probable cause under the Constitution? No. Under Bufkin's? Under Stahl? Do they have probable cause to dilly-dally around for 48 hours as a policy? We say no. That's not what the Fourth Amendment prints. Thank you, Your Honor. Thank you, Ms. Messel. Thank you also, counsel, for city and county. We appreciate all of your presence and the arguments you provided to the court this morning, the briefing you have submitted, and we'll take your case under advisement and render a decision in due course. Thank you.